**FILED**

DEC 2 8 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**YUKSEL CELIKGOGUS**
Kabakozmah
Yeni Adapazari Cad. Nr. 88
Karasu/Sakarya
Turkey;

                                    **Plaintiff,**

        - against -

**DONALD RUMSFELD**
**Department of Defense**
1000 Defense Pentagon
Washington D.C. 20301-1000;

CASE NUMBER   1:05CV02480

**AIR FORCE GENERAL RICHARD MYERS**
**Chairman, Joint Chiefs of Staff**
9999 Joint Chiefs of Staff Pentagon
Washington, D.C. 20318;

JUDGE: Ricardo M. Urbina

DECK TYPE: Civil Rights (non-employme:

DATE STAMP: 12/28/2005

**ARMY MAJOR GENERAL GEOFFREY MILLER**
**Former Commander, Joint Task Force**
**Guantánamo Bay Naval Base, Cuba,**
c/o United States Army
Army Pentagon
Washington, D.C. 20310-0200;

**ARMY GENERAL JAMES T. HILL**
**Commander, United States Southern Command**
C/o United States Army
Army Pentagon
Washington, D.C. 20310-0200;

**ARMY MAJOR GENERAL MICHAEL E. DUNLAVEY**
**Former Commander, Joint Task Force**
**Guantánamo Bay Naval Base, Cuba,**
C/o United States Army
Army Pentagon
Washington, D.C. 20310-0200;

**ARMY BRIG. GENERAL JAY HOOD**
**Commander, Joint Task Force, GTMO**
**Guantánamo Bay Naval Base, Cuba,**
c/o United States Army

- 1 -

**Army Pentagon**
**Washington, D.C. 20310-0200;**

**MARINE BRIG. GENERAL MICHAEL LEHNERT**
**Former Commander Joint Task Force-160**
**Guantánamo Bay Naval Base, Cuba**
**C/o United States Marines**
**Marine Pentagon**
**Washington, D.C.;**

**ARMY COL. NELSON J. CANNON**
**Former Commander, Camp Delta**
**Guantánamo Bay Naval Base, Cuba,**
**C/o United States Army**
**Army Pentagon**
**Washington, D.C. 20310-0200;**

**ARMY COLONEL TERRY CARRICO**
**Former Commander Camp X-Ray, Camp Delta**
**Guantánamo Bay Naval Base, Cuba,**
**C/o United States Army**
**Army Pentagon**
**Washington, D.C. 20310-0200;**

**ARMY LT. COLONEL WILLIAM CLINE**
**Former Commander, Camp Delta**
**Guantánamo Bay Naval Base, Cuba,**
**C/o United States Army**
**Army Pentagon**
**Washington, D.C. 20310-0200;**

**and**

**JOHN DOES 1-100, individuals involved in the illegal**
**torture of Plaintiff at Guantánamo Bay Naval Base**

**All in their personal capacities;**

                                    **Defendants.**

---

## COMPLAINT

(Violation of Alien Tort Claims Act, Fifth and Eighth Amendments to the U.S.
Constitution, Geneva Conventions, and Religious Freedom Restoration Act)

Plaintiff Yuksel Celikgogus, by and through his attorney, Barbara Olshansky and William Goodman of the Center for Constitutional Rights, as and for his complaint against Defendants Donald Rumsfeld, Air Force General Richard Myers, Army Major General Geoffrey Miller, Army General James T. Hill, Army Major General Michael E. Dunlavey, Army Brig. General Jay Hood, Marine Brig. General Michael Lehnert, Army Colonel Nelson J. Cannon, Army Colonel Terry Carrico, Army Lt. Colonel William Cline, and John Does 1-100, hereby allege as follows:

## INTRODUCTION

1.    Plaintiff Yuksel Celikgogus is a citizen of Turkey.  He is not now nor has he ever been a member of any terrorist group.  He has never taken up arms against the United States.

2.    Plaintiff Celikgogus has never taken up arms and has never engaged in any hostile activities.  On information and belief, the Pakistani army detained Plaintiff along with numerous other detainees who were not combatants; and handed detainees including Plaintiff to the custody of the United States in order to obtain bounty money. Upon information and belief, the United States took custody of Plaintiff Celikgogus without any independent good faith basis for concluding that he was or had been engaged in any activities hostile to the United States.

3.    Plaintiff was first held in United States custody in Afghanistan and later transported to the United States Naval Base in Guantánamo Bay Naval Station, Cuba ("Guantánamo"), where Defendants imprisoned them without charge for more than two years.  During Plaintiff's imprisonment, Defendants systematically and repeatedly tortured him in violation of the United States Constitution and domestic and international law, and deprived him of access to friends, relatives, courts and counsel. Defendants

repeatedly attempted to extract confessions from Plaintiff without regard to their truth or even plausibility through the use of the illegal methods detailed below. Plaintiff was released without charge on November 20, 2003 and has returned to his home in Turkey where he continues to suffer the physical and psychological effects of his captivity and torture as hereinafter alleged.

4.    In the course of his detention by the United States, Plaintiff was beaten every day for three hours for three months. He was punched, kicked, and beaten in the genitalia. He was forced to strip naked, subjected to repeated forced body cavity searches, intentionally subjected to extremes of heat and cold for the purpose of causing suffering, kept in filthy cages for 24 hours per day with no exercise or sanitation, deprived of adequate food, deprived of sleep, deprived of communication with family and friends, and deprived of information about his status.

5.    Plaintiff's detention and mistreatment were in plain violation of, the United States Constitution, United States statute and treaty obligations and customary international law. Defendants' treatment of Plaintiff and other Guantánamo detainees violated various provisions of law including the Fifth Amendment to the United States Constitution forbidding deprivation of liberty without due process, United States statutes prohibiting torture, assault, and other mistreatment, the Geneva Conventions, and customary international law norms prohibiting torture and other cruel, inhuman or degrading treatment.

6.    Plaintiffs' torture and other mistreatment was not simply the product of isolated or rogue action by individual military personnel. Rather it was the result of deliberate and foreseeable action taken by Defendant Rumsfeld and senior officers to flout or evade the United States Constitution, United States statute and treaty

obligations and universal and obligatory norms of customary international law. This action was taken in a misconceived and illegal attempt to utilize torture or other cruel, inhuman, or degrading acts to coerce nonexistent information regarding terrorism. It was misconceived because, according to the conclusion of the US military as expressed in the Army Field Manual, torture does not yield reliable information, and because Plaintiff—along with the vast majority of Guantánamo detainees—had no information to give. It was illegal because, as Defendants well knew, torture or other cruel, inhuman or degrading treatment of detainees is not permitted under the United States Constitution, United States statute and treaty obligations, and customary international law.

7.       In or around December 2, 2002, Defendant Rumsfeld signed a memorandum approving numerous illegal interrogation methods, including putting detainees in "stress positions" for up to four hours; forcing detainees to strip naked, intimidating detainees with dogs, interrogating them for 20 hours at a time, forcing them to wear hoods, shaving their heads and beards, keeping them in total darkness and silence, and using what was euphemistically called "mild, non-injurious physical contact." As Defendant Rumsfeld knew, these and other methods were in violation of the United States Constitution, United States statute and treaty obligations, the Geneva Conventions, and customary international law as reflected in *inter alia* the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). This memorandum of December 2, 2002, authorizing torture was originally designated by Defendant Rumsfeld to be classified for ten years but was later released at the direction of the President after the Abu Ghraib torture scandal became public.

8.         After authorizing, encouraging, permitting, and requiring the acts of torture and other mistreatment inflicted upon Plaintiff, Defendant Rumsfeld, on information and belief, subsequently commissioned a "Working Group Report" dated March 6, 2003, to address "Detainee Interrogations in the Global War on Terrorism: Assessment of Legal Historical, Policy and Operational Considerations." This report was also originally classified for a period of ten years by Defendant Rumsfeld but later released after the Abu Ghraib torture scandal became public. This report details the requirements of international and domestic law governing interrogations, including the Geneva Conventions; the CAT; customary international law; the torture statute,18 U.S.C. §2340; assault within maritime and territorial jurisdiction, 18 U.S.C. §113; maiming, 18 U.S.C. §114; murder, 18 U.S.C. §1111; manslaughter, 18 U.S.C. §1112; interstate stalking, 18 U.S.C. §2261a; and conspiracy 18 U.S.C. §2 and §371. The report attempts to address "legal doctrines under the Federal Criminal Law that could render specific conduct, otherwise criminal <u>not</u> unlawful." (emphasis in original). The memorandum is on its face an ex post facto attempt to create arguments that the facially criminal acts perpetuated by the Defendants were somehow justified. It argues first that the President as Commander-in-Chief has plenary authority to order torture, a proposition that ignores settled legal doctrine from King John at Runnymede to <u>Youngstown Sheet and Tube</u>. It next tries to apply common law doctrines of self-defense and necessity, arguing the odious and unprecedented proposition that the United States has the right to torture detained individuals because it needs to defend itself or because it is necessary that it do so. Finally, it suggests that persons inflicting torture will be able to defend against criminal charges by claiming that they were following orders. The report asserts that the detainees have no Constitutional rights

- 6 -

because the Constitution does not apply to persons held at Guantánamo. However, the report acknowledges that U.S. criminal laws do apply to Guantánamo, and further acknowledges that the United States is bound by the CAT to the extent that conduct barred by that Convention would also be prohibited by the Fifth, Eighth or Fourteenth Amendments to the Constitution. On June 22, 2004, the conclusions of this report and other memoranda attempting to justify torture were repudiated and rescinded by the President when they were made public after the photographs of torture at Abu Ghraib prison in Iraq were released.

9.      In April 2003, following receipt of this report, Defendant Rumsfeld issued a new set of recommended techniques, requiring approval for four techniques. These recommendations recognized specifically that certain of the approved techniques violated the Geneva Conventions and/or customary international law, including the use of intimidation, removal of religious items, threats and isolation. The April 2003 report, however, officially withdrew approval for unlawful actions that had been ongoing for months, including hooding, forced nakedness, shaving, stress positions, use of dogs or "mild, non-injurious physical contact." Nevertheless, these illegal practices continued to be employed against Plaintiffs and other detainees at Guantánamo.

10.     Defendants well knew that their activities resulting in the detention, torture, and other mistreatment of Plaintiff were illegal and violated clearly established law—i.e., the Constitution, statute and treaty obligations of the United States and customary international law. Defendants' after-the-fact attempt to create an Orwellian legal façade makes clear their conscious awareness that they were acting illegally. Therefore they cannot claim immunity from civil liability.

## JURISDICTION AND VENUE

11.          This Court has jurisdiction over Plaintiff's claims under 28 U.S.C. §
1331 (federal question jurisdiction); and 28 U.S.C. §1350 (Alien Tort Claims Act).

12.          Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(3)
and 28 U.S.C. § 1391(b)(2). The alleged acts described below are "inextricably bound
up with the District of Columbia in its role as the nation's capital." *Mundy v. Weinberger*,
554 F. Supp. 811, 818 (D.D.C. 1982). Decisions and acts by Defendants ordering,
facilitating, committing, and acquiescing in the commission of the alleged acts reached
the highest levels of the United States Government. On information and belief, approval
for all alleged acts emanated under color of law from orders, approvals, and omissions
occurring in the Pentagon, numerous government agencies headquartered in the
District of Columbia, and the offices of Defendant Rumsfeld, several of which are in the
District of Columbia. Venue for claims arising from acts of Cabinet officials, the
Secretary of Defense and United States agencies lies in the District of Columbia. *See
id.*; *Smith v. Cheney*, 927 F. Supp. 1 (D.D.C. 1996).

## PARTIES

13.          Plaintiff Yuksel Celikgogus was born in and was at all times relevant
hereto a citizen and resident of Turkey. He is not now and has never been a terrorist, a
member of a terrorist group, nor has he ever taken up arms against the United States.

14.          Defendant Donald Rumsfeld is the United States Secretary of
Defense. On information and belief, he is a citizen of Illinois and a resident of the District
of Columbia. Defendant Rumsfeld is charged with maintaining the custody and control
of the Guantánamo detainees including Plaintiffs and with assuring that their treatment
was in accordance with law. Defendant Rumsfeld ordered, authorized, condoned and

has legal responsibility for the illegal arbitrary detention, torture and mistreatment of Plaintiffs as alleged herein. Defendant Rumsfeld is sued in his individual capacity.

15.       Defendant Myers is a General in the United States Air Force and was at times relevant hereto Chairman of the Joint Chiefs of Staff. On information and belief, he is a citizen and resident of Virginia. As senior uniformed military officer in the chain of command, Defendant Myers is responsible for the custody and control of the Guantánamo detainees, including Plaintiffs, and with assuring that their treatment was in accordance with law. On information and belief, Defendant Myers was informed of torture and other mistreatment of detainees at Guantánamo and Abu Ghraib prison in Iraq and condoned such activities. Defendant Myers was in regular contact with the Defendant Rumsfeld and participated in and implemented decisions taken in the District of Columbia. Defendant Myers is sued in his individual capacity.

16.       Defendant Miller is a Major General in the United States Army and was at times relevant hereto Commander of Joint Task Force-GTMO. On information and belief, he is a citizen and resident of Texas. At times relevant hereto, he had supervisory responsibility for Guantánamo detainees including Plaintiffs and was responsible for assuring that their treatment was in accordance with law. On information and belief, Defendant Miller was in regular contact with the Defendant Rumsfeld and other senior officials in the chain of command based in the District of Columbia and participated in and implemented decisions taken in the District of Columbia. On information and belief, Defendant Miller implemented and condoned numerous methods of torture and other mistreatment as hereinafter described. On information and belief, Defendant Miller was subsequently transferred to Abu Ghraib where he implemented and facilitated torture and other mistreatment that were filmed

and photographed and which have justly inspired widespread revulsion and condemnation around the world. Defendant Miller is sued in his individual capacity.

17.     Defendant Hill is a General in the United States Army and was at times relevant hereto Commander of the United States Southern Command. On information and belief, he is a citizen and resident of Texas. On information and belief, Defendant Hill was in regular contact with Defendant Rumsfeld and other senior officials in the chain of command based in the District of Columbia and participated in and implemented decisions taken in the District of Columbia. On information and belief, General Hill requested and recommended approval for several abusive interrogation techniques.

18.     Defendant Dunlavey is a Major General in the United States Army and was at times relevant hereto commander of Joint Task Forces 160/170, successors to Joint Task Force-GTMO. On information and belief, he is a citizen and resident of Pennsylvania. At times relevant hereto, he had supervisory responsibility for Guantánamo detainees including Plaintiffs and for their legal treatment. On information and belief, Defendant Dunlavey was in regular contact with Defendant Rumsfeld and other senior officials in the chain of command based in the District of Columbia and participated in and implemented decisions taken in the District of Columbia. On information and belief, Major General Dunlavey implemented and condoned the cruel, inhuman or degrading acts and conditions alleged hereafter. Defendant Dunlavey is sued in his individual capacity.

19.     Defendant Hood is a Brigadier General in the United States Army and is the Commander of Joint Task Force- GTMO, which at all relevant times operated the detention facilities at Guantánamo. On information and belief, he is a citizen of

South Carolina.   At times relevant hereto, he had supervisory responsibility for Guantánamo detainees including Plaintiffs and for assuring that that their treatment was in accordance with law.  On information and belief, Defendant Hood was in regular contact with the Defendant Rumsfeld and other senior officials in the chain of command based in the District of Columbia and participated in and implemented decisions taken in the District of Columbia.  Defendant Hood is sued in his individual capacity.

20.        Defendant Lehnert is a Brigadier General in the United States Marine Corps and was at times relevant hereto Commander of the Joint Task Force responsible for the construction and operation of Camp X-Ray and Camp Delta at Guantánamo. On information and belief, he is a citizen and resident of Florida.  At times relevant hereto, he had supervisory responsibility for Guantánamo detainees including Plaintiffs and for assuring that their treatment was in accordance with law.   On information and belief, Defendant Lehnert was in regular contact with Defendant Rumsfeld and other senior officials in the chain of command based in the District of Columbia and participated in and implemented decisions taken in the District of Columbia.  Defendant Lehnert is sued in his individual capacity.

21.        Defendant Cannon is a Colonel in the United States Army and the Commander of Camp Delta at Guantánamo. On information and belief, he is a citizen and resident of Michigan.  At times relevant hereto, he had supervisory responsibility for Guantánamo detainees including Plaintiffs and for their legal treatment.  On information and belief, Defendant Cannon was in regular contact with Defendant Rumsfeld and other senior officials in the chain of command based in the District of Columbia and participated in and implemented decisions taken in the District of Columbia.  Defendant Cannon is sued in his individual capacity.

22.        Defendant Carrico is a Colonel in the United States Army and was at times relevant hereto Commander of Camp X-Ray and Camp Delta at Guantánamo. On information and belief, he is a citizen and resident of Texas. At times relevant hereto, he had supervisory responsibility for Guantánamo detainees including Plaintiffs and for assuring that their treatment was in accordance with law. On information and belief, Defendant Carrico was in regular contact with Defendant Rumsfeld and other senior officials in the chain of command based in the District of Columbia and participated in and implemented decisions taken in the District of Columbia. Defendant Carrico is sued in his individual capacity.

23.        Plaintiff does not know of the true names and capacities of Defendants sued herein and therefore sue these defendants by fictitious names, John Does 1-100. Plaintiff will amend this complaint to allege their true names and capacities when ascertained. John Does 1-100 were the military and civilian personnel who participated in the torture and other mistreatment of Plaintiff as hereinafter alleged.

## **FACTUAL ALLEGATIONS**

24.        Plaintiff Celikgogus was born on October 1, 1967 to Ibrahim and Hanife Celikgogus. He finished seven years of school, and then went to work at a wood processing plant in order to help provide for his family, which is very large. Plaintiff Celikgogus worked at several different small woodworking plants for thirteen years.

25.        Plaintiff Celikgogus fulfilled his military duty in 1987, and was married in 1991. He and his wife now have three children.

26.        At no time in his life has Plaintiff Celikgogus ever been in trouble with the police or the Justice Department in Turkey. He has never been accused of any crime.

27.    Plaintiff Celikgogus and his brothers decided to sell a portion of their family's land in order to raise the money to purchase new woodworking machines and start their own family business.

28.    After a period of time, the family woodworking business failed, and Plaintiff Celikgogus found himself, along with his brothers, in serious debt.

29.    Plaintiff Celikgogus left Turkey for Pakistan with a friend, Mustafa Eksi, to try to find work that would help him repay his outstanding debts.

30.    Plaintiff Celikgogus's destination was Kuvetta in Pakistan, where he stayed for one month, and then left to return to Turkey.

31.    Plaintiff Celikgogus and his friend, stayed one night in Kandahar, and then one night in Kabul.  In Kabul, the owner of the hotel, who was an Imam, introduced Plaintiff Celikgogus and his friend to another Turkish man, who invited Plaintiff Celikgogus to stay in his house.  Plaintiff Celikgogus decided to stay for a few days, and when the man offered for him to stay longer to study the Qu'ran with him, Plaintiff Celikgogus decided to stay for several months.

32.    Plaintiff Celikgogus left his passport and money with the man he was staying with for safekeeping.

33.    When the news was announced on the radio that the U.S. was planning to bomb Afghanistan, Plaintiff Celikgogus decided that it was time to leave for Turkey.  He left Kabul, and went first to Logar, where he stayed several weeks in a tent with others also trying to flee from the war.

34.    Because Plaintiff Celikgogus had left his identity papers at the house in Kabul, which was under attack, he was unable to travel back to Turkey.

35.    Plaintiff Celikgogus met another man who offered him a ride to Celalabad. The people in that village told him that there was no chance of getting out of the country because the U.S. military was stationed at every border crossing and Plaintiff Celikgogus had no papers with him to prove his identity.

36.    One day, Plaintiff Celikgogus was asked if he wanted to go with a group that was headed to Pakistan. The first village that they came to was Pesaver. In the village, the townspeople provided the group with food and then split up the group to drive them into the main city.

37.    Plaintiff Celikgogus realized when they entered the City of Pesaver that he and the other members of his group were going to be handed over to a regiment of the Pakistani Army. In the jail facility, he was given little food and no covering despite the fact that the jail was very cold. Many men were placed in a very small room. They were placed in chains, two persons together, and had to move everywhere together. They were forced to undertake all hygiene matters together.

38.    No U.S. forces were present when Plaintiff was detained. Therefore, no U.S. forces could have had any information regarding Plaintiff other than that supplied by the local Pakistani forces, who were known to be unreliable and who were receiving a per head bounty of, on information and belief, up to $ 35,000.

### Detention in Afghanistan

39.    After a week in the Pakistani jail, his jailers bandaged Plaintiff Celikgogus's eyes, searched his clothes and his body, and then took him on a four-hour trip in a truck to another jail. During the trip his legs and hands were chained and he was unable to move. He was in such tremendous pain that he cried for the entire trip.

40.    Upon information and belief, during this trip the truck crossed the border into Afghanistan.

41.    Plaintiff Celikgogus was held for approximately one month in this jail, where he was forced to sleep on an iron floor with no covering. He was interviewed and photographed several times.

42.    When the Americans came to the jail, they also photographed him and interrogated him many times. In these interrogations, they asked him why he was in Afghanistan.

43.    The Americans made Plaintiff and others form groups of 30 people, put on blue overalls, and sacks over their heads. Plaintiff's hands and feet were chained and shackled.

44.    In the truck, Plaintiff and his group were driven for three hours and were taken to an airport. He was placed on the airplane with hooded and shackled. The plane landed at an American-run airbase in Kandahar.

45.    When Plaintiff Celikgogus exited the plane, he was instructed to lay on the ground, whereupon he was kicked repeatedly by those guarding him.

46.    Plaintiff was then instructed to open his legs, and was hit and kicked in the genitals a number of times.

47.    Plaintiff was then taken to a room, where they removed his clothes and took photographs of him naked. After this, he was beaten remorselessly for three hours.

48.    Plaintiff Celikgogus held in this prison for nearly three months. During this time, he suffered multiple beatings for hours and other brutal assaults.

49.    Plaintiff never engaged in combat against the forces of the United States or any other entity.  Plaintiff has never conducted any terrorist activity or conspired, intended to, or planned any such activity.  Plaintiff has never belonged to Al Qaeda or any other terrorist organization.

50.    Upon information and belief, Plaintiff was continually exposed to extremely cold conditions without adequate clothing, confined to tight spaces, and was forced to ration food.  Prison conditions were filthy.

51.    During the three months of his imprisonment in Kandahar, Plaintiff Celikgogus was in the exclusive physical custody and control of the United States military.  In freezing temperatures, Plaintiff was stripped of his clothes, searched, and photographed naked while being held by Defendant John Does, American soldiers. American military personnel interrogated Plaintiff on numerous occasions.    At no time was Plaintiff Celikgogus afforded counsel or given the opportunity to contact his family.

52.    One day, the American soldiers brought all of the Turkish prisoners together, removed their clothes, and took photographs of them.  Plaintiff Celikgogus and the others were told to put on red overalls and were hooded, chained, and shackled again.  They were forced to get onto a large cargo plane, and endure a trip lasting 27 hours.  They were chained to the floor with no backrests.   They were forced by Defendant John Does to sit in an uncomfortable position for the entire flight and were not allowed to move or given access to toilet facilities.

53.    When the plane landed, Plaintiff realized that he was in Cuba.  A truck drove Plaintiff and the other Turkish prisoners were taken directly to a ship which brought them to the American prison camp.

## Captivity and Conditions at Camp X-Ray, Guantánamo

54.        Upon arrival at Guantánamo, Plaintiff was taken to Camp X-Ray, the prison camp for detainees.  On arrival, soldiers forced Plaintiff to squat outside in stress positions in the extreme heat.  Plaintiff and the other detainees had their hoods removed, but they had to remain with eyes closed and were not allowed to speak.

55.        After processing, Plaintiff and others were placed in wire cages of about 2 meters by 2 meters.  Conditions were cruel, inhuman and degrading.

56.        Plaintiff was deliberately fed inadequate quantities of food, keeping them in a perpetual state of hunger.  Much of the food consisted of "MRE's" (meals ready to eat), which were ten to twelve years beyond their usable date.  Plaintiff was served out of date powdered eggs and milk, stale bread from which the mold had been picked out and fruit that was black and rotten.

57.        Plaintiff was denied the ability to sleep at night for the entire period of his confinement in the camp.

58.        Plaintiff was forcibly given pills and injections of an unspecified substance and was not told what these medications were for.  There was no way to escape this forced medical treatment.

59.        On various occasions, Plaintiff's efforts to pray were banned or interrupted.  On one occasion, a guard in Plaintiff's cellblock threw a copy of the Koran in a toilet bucket.  Detainees were also at times prevented from calling out the call to prayer, with American soldiers either silencing the person who was issuing the prayer call or playing loud music to drown out the call to prayer.  This was part of a continuing pattern of disrespect and contempt for Plaintiff's religious beliefs.

## Interrogation at Camp X-Ray

60.      Plaintiff was extensively interrogated at Camp X-Ray, over 19 times during this initial three-four month period.

61.      Upon information and belief, during interrogations, Plaintiff was typically "long shackled," whereby their legs were chained using a large padlock.  The shackles had sharp edges that scraped the skin, and Paintiff experienced deep cuts on and around his ankles, resulting in scarring and continuing chronic pain. During the interrogations, Plaintiff was shackled and chained to the floor.  Plaintiff was repeatedly urged by American interrogators to admit that they were fighters who went to Afghanistan for jihad.

## Conditions at Camp Delta

62.      On a date unknown to Plaintiff, but known to Defendants, Plaintiff was transferred to Camp Delta.

63.      At no time was Plaintiff advised as to why he was being transferred, for what purpose he was detained, why he was considered an "unlawful combatant," and what medical and legal resources might be available.

64.      During his time at Camp Delta, Plaintiff was aware that some of the prisoners tried to commit suicide.

65.      During the night, guards would enter Plaintiff's cell and take away his bedcovers and mat and force him to sleep on the iron bed frame.  If he tried to hold on to the bedcovers, he was sprayed in the eyes with a chemical that made his eyes burn.

66.        On a date unknown to Plaintiff, but known to Defendants, Plaintiff was told that he would be sent home soon to Turkey.   But he continued to be interrogated for five months after he was told this.

67.        Finally, Plaintiff was compelled to take a lie detector test.

68.        Before leaving Camp Delta, Plaintiff was asked to sign several papers.   He did not understand what he was signing and objected to signing them.   He was filmed by a video camera while he was being interrogated and forced to sign the statements.   The statements had many paragraphs in them; I was told that some of them said that I was captured during war.   Plaintiff signed the paper in order to get released.

69.        Plaintiff was released from Camp Delta and flown to Turkey.   He was briefly questioned by the Turkish authorities and immediately released.

### Injuries

70.        Plaintiff suffered and continues to suffer from the cruel, inhuman, and degrading treatment he experienced during his detention.

### Development and Implementation of a Plan of Torture and Physical and Psychological Abuse of Detainees

71.        The torture, threats, physical and psychological abuse practiced upon Plaintiff were devised, approved, and implemented by Defendant Rumsfeld and other Defendants in the military chain of command.   These techniques were intended as interrogation techniques to be used on detainees.

72.        It is well-established that the use of force in interrogation is prohibited by domestic and international law.   The United States Army strictly prohibits the use of such techniques and advises its interrogators that their use may lead to criminal prosecution.   Army Field Manual 34-52, "Intelligence Interrogation," provides:

## Prohibition Against Use of Force

The use of force, mental torture, threats, insults, or exposure to unpleasant and inhumane treatment of any kind **is prohibited by law** and is neither authorized nor condoned by the US Government... The psychological techniques and principles outlined should neither be confused with, nor construed to be synonymous with, unauthorized techniques such as brainwashing, mental torture, or any other form of mental coercion to include drugs. These techniques and principles are intended to serve as guides in obtaining the willing cooperation of a source. The absence of threats in interrogation is intentional, as their enforcement and use normally **constitute violations of international law and may result in prosecution under the UMP.** (emphasis supplied).

73.       Further, according to Field Manual 34-52: "Experience indicates that the use of force is not necessary to gain the cooperation of sources for interrogation. Therefore, the use of force is a poor technique, as it yields unreliable results, may damage subsequent collection efforts, and can induce the source to say whatever he thinks the interrogator wants to hear."

74.       Army Field Manual 27-10, "The Law of Land Warfare," summarizes the domestic and international legal rules applicable to the conduct of war. FM 27-10 recognizes the following sources of the law of war:

The law of war is derived from two principal sources:

a.      *Lawmaking Treaties (or Conventions)*, such as the Hague and Geneva Conventions.

b.      *Custom.* Although some of the law of war has not been incorporated in any treaty or convention to which the United States is a party, this body of unwritten or customary law is firmly established by the custom of nations and well defined by recognized authorities on international law.

75.       In spite of the prohibitions on the use of force, threats, and abuse in the Army Field Manual, and its clear acknowledgement that their use

ii.    Outrages upon personal dignity, in particular, humiliating and degrading treatment.

79.    The Third Geneva Convention of 1949, Art. 130, bars the "willful killing, torture or inhuman treatment, willfully causing great suffering or serious injury to body or health" of any prisoner of war.

80.    In February 2002, the White House issued a press release, which advised:

> The United States is treating and will continue to treat all of the individuals detained at Guantánamo humanely and, to the extent appropriate and consistent with military necessity, in a manner consistent with the principles of the Third Geneva Convention of 1949.
>
> The President has determined that the Geneva Convention applies to the Taliban detainees, but not to the al-Qaeda detainees. Al-Qaeda is not a state party to the Geneva Convention; it is a foreign terrorist group. As such, its members are not entitled to POW status.

81.    On information and belief, Defendant Rumsfeld and all Defendants were aware of this statement of the President. Moreover, Defendant Rumsfeld knew that this statement of policy was a departure from the previous policy of the United States that the laws of war, including the Geneva Conventions were always to be honored. Defendant Rumsfeld knew that the Department of State and the uniformed services took the generally recognized position that the Geneva Conventions could not be abrogated or ignored.

82.    However, Defendant Rumsfeld and others deliberated failed to implement the Presidential directive in any event. Defendant Rumsfeld and other Defendants in the chain of command had no good faith basis for believing that

Plaintiffs were members of or affiliated with Al Qaeda in any way. Indeed, the policy as announced was incoherent in that Defendant Rumsfeld and the other defendants had no way of knowing who was and who was not a member of Al-Qaeda or the Taliban and Defendants took no steps to implement any reliable fact-finding process which might ascertain who was and who was not a member of Al-Qaeda or the Taliban, including in particular a "competent tribunal" as mandated by the Third Geneva Convention, Art. 5, U.S. military regulations and long standing practice of the U.S. armed forces

83.        Defendant Rumsfeld and all Defendants were aware that torture and other mistreatment perpetrated under color of official authority violate domestic and international law.

84.        Defendant Rumsfeld and all Defendants were aware that Plaintiff was tortured and abused or was substantially certain to be tortured and abused at Guantánamo.

85.        Defendant Rumsfeld and all Defendants took no steps to prevent the infliction of torture and other mistreatment to which Plaintiff was subjected.

86.        Defendant Rumsfeld and all Defendants authorized and encouraged the infliction of torture and other mistreatment against Plaintiff.

87.        Defendant Rumsfeld and all Defendants were aware that prolonged, arbitrary detention violates customary international law.

88.        Defendant Rumsfeld and all Defendants authorized the prolonged arbitrary detention of Plaintiff.

**Count I**
**ALIEN TORT CLAIMS ACT**
**Prolonged Arbitrary Detention**

89.　　　　Plaintiff repeats and re-alleges the allegations contained in all preceding paragraphs of this complaint as if fully set forth herein.

90.　　　　As stated by the Supreme Court of the United States, the allegations contained herein "unquestionably describe 'custody in violation of the Constitution or laws or treaties of the United States.'"  *Rasul v. Bush*, 124 S. Ct. 2686, 2690, n.15 (2004)(citation omitted).

91.　　　　Plaintiff was unarmed and was detained in a prison camp operated by non-U.S. forces.  Plaintiff never engaged in combat, carried arms, or participated in terrorist activity or conspired with any terrorist person or organization.  Defendants could have had no good-faith reason to believe that he had done so.

92.　　　　Plaintiff was detained under the exclusive custody and control of Defendants for *over two years* without due process, access to counsel or family, or a single charge of wrongdoing being levied against him.

93.　　　　The acts described herein constitute prolonged arbitrary detention in violation of the law of nations under the Alien Tort Claims Act, 28 U.S.C. §1350, in that the acts violated customary international law prohibiting arbitrary detention as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

94.　　　　Defendants are liable for said conduct in that Defendants set the conditions, directly and/or indirectly facilitated, ordered acquiesced, confirmed, ratified and or/conspired together in bringing about the prolonged arbitrary detention of Plaintiff.

101.        Plaintiff suffered severe immediate physical and psychological abuse as a result of the acts alleged herein. Plaintiff continues to suffer profound physical and psychological trauma from the acts alleged herein.

102.        Plaintiff is entitled to monetary damages and other relief to be determined at trial.

### Count III
### ALIEN TORT CLAIMS ACT-
### Cruel, Inhuman or Degrading Treatment

103.        Plaintiff repeats and re-alleges the allegations contained in all preceding paragraphs of this complaint as if fully set forth herein.

104.        The acts described herein had the intent and the effect of grossly humiliating and debasing Plaintiff, forcing them to act against their will and conscience, inciting fear and anguish, and breaking their physical and moral resistance.

105.        These acts included *inter alia* repeated severe beatings; the withholding of food, water, and necessary medical care; sleep deprivation; lack of basic hygiene; intentional exposure to extremes of heat and cold; the elements, continuous isolation for a period of months; forced injections; sexual humiliation; intimidation with unmuzzled dogs; and death threats.

106.        The acts described herein constitute cruel, inhuman or degrading treatment in violation of the law of nations under the Alien Tort Claims Act, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting cruel, inhuman or degrading treatment as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions and other authorities.

107.     Defendants are liable for said conduct in that Defendants set the conditions, directly and/or indirectly facilitated, ordered acquiesced, confirmed, ratified and or/conspired together in bringing about the cruel, inhuman or degrading treatment of Plaintiff.

108.     Plaintiff suffered severe immediate physical and psychological abuse as a result of the acts alleged herein.  Plaintiff continues to suffer profound physical and psychological trauma from the acts alleged herein.

109.     Plaintiff is entitled to monetary damages and other relief to be determined at trial.

### Count IV
### VIOLATION OF THE GENEVA CONVENTIONS

110.     Plaintiff repeats and re-alleges the allegations contained in all preceding paragraphs of this complaint as if fully set forth herein.

111.     As detailed herein, Plaintiff was held arbitrarily, tortured and otherwise mistreated during their detention in violation of specific protections of the Third and Fourth Geneva Conventions including but not limited to Article 3 common to all four Geneva Conventions.

112.     Violations of the Geneva Conventions are direct treaty violations as well as violations of direct treaty violations.

113.     Defendants are liable for such conduct directly and insofar as they directed, ordered, confirmed, ratified and/or conspired together to commit violations of the Geneva Conventions.

114.     As a result of Defendants' violations of the Geneva Conventions, Plaintiff is entitled to monetary damages and other relief to be determined at trial.

**Count V**
## CLAIMS UNDER THE CONSTITUTION OF THE UNITED STATES
### Violation of the Fifth Amendment

115.    Plaintiff repeats and re-alleges the allegations contained in all preceding paragraphs of this complaint as if fully set forth herein.

116.    Defendants' actions alleged herein against Plaintiff violated the Fifth Amendment of the United States Constitution.

117.    The arbitrary and baseless detention of Plaintiff for more than two years constituted a clear deprivation of his liberty without due process, in direct violation of his Fifth Amendment rights.

118.    The cruel, inhuman, degrading, and unusual conditions of Plaintiff's incarceration clearly violated their substantive rights to due process.  See City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983).

119.    Defendants' refusal to permit Plaintiff to consult with counsel or to have access to neutral tribunals to challenge the fact and conditions of his confinement constituted violations of Plaintiff's procedural rights to due process.

120.    The abusive conditions of Plaintiff's incarceration served no legitimate government purpose.

121.    Defendants were acting under the color of the law of the United States at all times pertinent to the allegations set forth above.

122.    Plaintiff suffered severe physical and mental injuries as a result of Defendants' violations of the Fifth Amendment.  He has also suffered present and future economic damage.

123.    The actions of Defendants are actionable under Bivens v. Six Unknown Named Federal Agents, 450 U.S. 388 (1971) ("Bivens").

124.        Plaintiff is entitled to monetary damages and other relief to be determined at trial.

**Count VI**
**CLAIM UNDER THE RELIGIOUS FREEDOM RESTORATION ACT**

125.        Plaintiff repeats and re-alleges the allegations contained in all preceding paragraphs of this complaint as if fully set forth herein.

126.        Defendants' actions alleged herein inhibited and constrained religiously motivated conduct central to Plaintiff's religious beliefs.

127.        Defendants' actions imposed a substantial burden on Plaintiff's abilities to exercise and express their religious beliefs.

128.        Defendants regularly and systematically engaged in practices specifically aimed at disrupting Plaintiff's religious practices.  These acts included throwing a copy of the Koran in a toilet bucket, prohibiting prayer, deliberately interrupting prayers, playing loud music to interrupt prayers, and withholding the Koran without reason or as punishment, and confining Plaintiff under conditions where it was impossible or infeasible for them to exercise their religious rights.

129.        Defendants were acting under the color of the law of the United States at all times pertinent to the allegations set forth above.

130.        Plaintiff suffered damages as a direct and proximate result of Defendants' violations of the Religious Freedom Restoration Act, 42 U.S.C.A. § 2000bb et seq.

131.        Plaintiff is entitled to monetary damages and other relief to be determined at trial.

WHEREFORE Plaintiff each demand judgment against Defendants jointly and severally, including compensatory damages in the amount of $10,000,000 each (Ten Million Dollars), the costs of this action, including reasonable attorneys' fees, and such other and further relief as this Court may deem just and proper.

Dated:December 28, 2005

Barbara Olshansky (NY0057)
William Goodman
Michael Ratner
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, New York 10012
Ph: (212) 614-6439
Fax: (212) 614-6499

*Attorneys for Plaintiff*